# IN THE COURT OF APPEALS OF IOWA

No. 23-0186
Filed January 24, 2024

**ESTATE OF SENA J. WIEBKE, by MONTE KELLER, Special Executor,**
Plaintiff-Appellant,

**vs.**

**KEITH WIEBKE,**
Defendant-Appellee.
_____

Appeal from the Iowa District Court for Butler County, James M. Drew, Judge.

The special executor of an estate appeals the district court's order denying a petition to set aside the transfer of real property. **AFFIRMED.**

Matthew J. Hemphill of Bergkamp, Hemphill & McClure, P.C., Adel, for appellant.

D. Raymond Walton, Waterloo, for appellee.

Considered by Bower, C.J., and Buller and Langholz, JJ.

**BOWER, Chief Judge.**

The Estate of Sena Wiebke, by and through special executor Monte Keller, appeals the district court's order denying a petition to set aside the transfer of real property claiming undue influence. Upon our review, we affirm.

## I.     *Background Facts and Proceedings*

At the time of her death, Sena Wiebke owned a house and roughly ninety-five acres of farmland ("properties") in Allison, Iowa. She was survived by two children, Keith, and Joan.

In 2010, Wiebke executed a general power of attorney, naming Keith as her attorney-in-fact. Keith remained in this position until Wiebke's death.

In 2016, Wiebke began having health issues. She managed to remain in her home until 2019, with help from Keith and his ex-wife, who assisted her with finances, groceries, and medication. Meanwhile, Wiebke's relationship with Joan soured, culminating in Wiebke requesting in the of fall 2016 that Joan no longer contact her.

In June 2017, Keith contacted attorney Ethan Epley on Wiebke's behalf to draft two quitclaim deeds transferring ownership of her properties to Keith. Wiebke hoped by doing so she could avoid probate and qualify for Medicaid benefits. On June 28, Epley met with Wiebke in her home to discuss the quitclaim deeds. Epley testified he asked Keith to leave the room and had a candid conversation with Wiebke about transferring ownership of her properties. Wiebke expressed she was grateful to Keith for caring for her. Wiebke also shared she was concerned Joan's creditors may be able to force a sale of the home due to Joan's 1996 conviction for mail fraud and money laundering.

With deteriorating health, Wiebke moved to a nursing facility. During her time there, Wiebke made clear to staff she did not want Joan to visit. In January 2019, nursing facility administrator Heather Sells received a letter, dated October 17, 2016, in which Wiebke made this stance apparent. After receiving the letter, Sells entered it into Wiebke's file. Sells and the facility's director of nursing followed up with Wiebke in person to verify she did not want Joan to visit, which Wiebke confirmed. Betty Schmidt, a social worker, followed up with Wiebke on this issue three more times in early 2019. Randi Derifield, another social worker, followed up with Wiebke on this issue later that year. On all occasions, Wiebke maintained she did not want Joan to visit.

The nursing facility sent Joan letters on multiple occasions, informing her of Wiebke's wishes. The facility sent eight letters by certified mail, all returned as Joan did not pick them up. Finally, the facility sent the letter by standard mail. Neither Joan nor her husband ever visited the facility.

Wiebke died in December 2019. A will executed by Wiebke in May 2006 was admitted to probate. The will distributed Wiebke's home to her five grandchildren in equal parts, half of her real property to Keith, and the remaining half of her real property equally to Keith and Joan. Joan's interest was dispersed subject to a trust with a spendthrift clause.

Joan died one year later, survived by three children. In May 2021, one of the children, Monte Keller, sought appointment as special executor of the Wiebke estate. In December, he gained authority to investigate whether the transfer of property to Keith was the result of undue influence. In January 2022, Keller filed a petition raising this claim.

Following a hearing, the district court entered an order finding although there was a confidential relationship between Keith and Wiebke, Keith's efforts to care for Wiebke "belie an intention to wrongfully procure an improper favor." The district court also found "Wiebke knew what she was doing and had legitimate, rational reasons for doing it." The court dismissed Keller's petition. Keller, in his role as special executor of Wiebke's estate, appeals the court's order.

## II.      Standard of Review

Because this action is in equity, our standard of review is de novo. Iowa R. App. P. 6.907. We give weight to the fact findings of the district court, particularly as to credibility of witnesses, but we are not bound by them. Iowa R. App. P. 6.904(3)(g).

## III.     Analysis

A claim of undue influence consists of four elements:

> (1) The [grantor] must be susceptible to undue influence, (2) opportunity [on the part of the grantee] to exercise such influence and effect the wrongful purpose must exist, (3) a disposition [on the part of the grantee] to influence unduly for the purpose of procuring an improper favor must be present, and (4) the result must clearly appear to be the effect of undue influence.

*In re Est. of Herm*, 284 N.W.2d 191, 200–01 (Iowa 1979). If the party challenging transfer of property can show a fiduciary or confidential relationship existed, the transfer is considered presumptively fraudulent. *Mendenhall v. Judy*, 671 N.W.2d 452, 454 (Iowa 2003). "[T]he burden of proof shifts to the grantee to negate a presumption of undue influence by clear, convincing, and satisfactory evidence." *Id.* at 454–55. The grantee must show he "acted in good faith

throughout the transaction and the grantor acted freely, intelligently, and voluntarily." *Jackson v. Schrader*, 676 N.W.2d 599, 605 (Iowa 2003).

The parties agree Keith had a confidential relationship with Wiebke because he was her attorney-in-fact. Accordingly, we must presume the transfer was fraudulent, absent clear and convincing evidence to the contrary.

Wiebke and Joan were, as the district court stated, "for all practical purposes, estranged from one another." Wiebke consistently expressed concerns that Joan's creditors could reach the properties through the probate process. Joan rarely corresponded with Wiebke, while Keith took care of her day-to-day needs. The record establishes without Keith and his ex-wife, Wiebke would not have been able to live in her home as long as she did. As the court observed, "The effort required of Keith is not lost on the court. Given Joan's absence and Keith's undertaking in helping their mother, it is understandable [Wiebke] would choose to favor him by giving him her real estate." Under these circumstances, it is not surprising she wanted to transfer the properties to Keith. The transfer accomplished two goals: protecting the properties from Joan's potential creditors and rewarding Keith for caring for Wiebke as she aged.

Contrary to concerns voiced by Keller, the record reflects Wiebke was aware of her decisions at the time of deed. Nurse practitioner Jodi Bangasser cared for Wiebke from 2016 until Wiebke's death in the nursing facility, and she testified Wiebke experienced mental decline characterized by short-term memory loss but was otherwise alert and oriented to person, place, and time. Others also testified about Wiebke's alertness during this period, including: Heather Sells, nursing facility administrator, who testified Wiebke's mental condition actually

improved during her time in long-term nursing care[1]; Michael Lammers, longtime family friend and local sheriff's deputy, who stated he did not observe any mental impairment as Wiebke aged; and Brian Kruse, Wiebke's neighbor and longtime friend, who testified he did not see any decline in Wiebke's cognition over the years.[2]

Additionally, like the district court, we find the testimony of attorney Epley reliable and instructive. Epley held a private conversation with Wiebke to ensure she wanted to transfer ownership of the properties to Keith. Wiebke candidly discussed her will, her children, her concerns with Joan's creditors, and her gratitude to Keith for his care. Wiebke would not have had such a candid, private discussion with Epley if she were of unsound mind or being coerced by Keith. The district court found:

> [U]ndue influence is seldom capable of direct proof and that Keith was in a position to exercise undue influence if that were his intent. However, the help he was providing [Wiebke] went above and beyond what most would do in similar circumstances. His efforts belie an intention to wrongfully procure an improper favor. When the transfers were made [Wiebke] knew what she was doing and had legitimate, rational reasons for doing it.

Upon our review, we conclude Keith has established by clear and convincing evidence the transfer of properties was not the result of undue influence. Accordingly, we affirm.

**AFFIRMED.**

---

[1] Specifically, Sells testified, "[U]pon her admission [to the nursing facility, Wiebke's] [cognition test] score was [ten] out of [fifteen]. Ten, we rank that as cognitively impaired or moderately impaired. But throughout her documentation, her [cognition test scores] actually did go up to a [twelve], which is considered cognitively intact."

[2] As Kruse testified, "I can't recall her ever slipping up in a conversation with me."